UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 15-113-HRW

JULIA SENTERS,                                       PLAINTIFF,

v.                **MEMORANDUM OPINION AND ORDER**

BOYD COUNTY, KENTUCKY,
BOYD COUNTY SHERIFF'S OFFICE,
JASON C. NATTIER, *Individually and
in his Official Capacity as Deputy Boyd County Sheriff,*
SCOTT CRAWFORD, *Individually and
in his Official Capacity as Deputy Boyd County Sheriff*
and GREG POWERS, *Individually and
in his Official Capacity as Deputy Boyd County Sheriff,*          DEFENDANTS.

This matter is before the Court upon Defendants' Motion for Summary Judgment [Docket No. 42]. The issues have been fully briefed by the parties [Docket Nos. 50 and 53]. For the reasons set forth herein, this Court finds that the Defendants are entitled to judgment as a matter of law.

The lawsuit involves allegations of excessive use of force arising from the arrest of Julia Senters on December 9, 2014. Senters alleges that Defendant Boyd County Sheriff Deputies Jason Nattier, Scott Crawford and Greg Powers violated Plaintiff's rights under the United States Constitution to be free from unreasonable use of force and to receive due process, as well as various state laws and that Defendants Boyd County and Boyd County Sheriff's Office were negligent in their training, retention and supervision of these Deputies. She seeks compensatory and punitive damages, as well as applicable fees and costs.

1

**I.**

On December 9, 2014, Plaintiff, Julia Senters was at her home on Rockhouse Road in Boyd County, Kentucky with Aaron Niswonger and Gregory George. [Docket No. 46, Deposition of Julia Senters, p. 108]. Senters cannot recall how long Niswonger and George were at her house that day, but testified that they were both drinking. *Id.* at pp.113-114.

Sometime between 8:00 and 10:00 p.m., a fight broke out between the two men while Senters was in another room. *Id.* at pp. 113-114. During the altercation, George sustained a large cut on his head and scalp. *Id.* Senters formerly worked in the medical field so she attempted to stop the bleeding by stapling George's scalp. *Id.* at p. 116.

At some point., Niswonger left Senters' home. *Id.* Shortly thereafter, Senters drove George to his friend, Bill Niswsonger's, Aaron's brother, house in Ashland. *Id.* at p. 120. She then returned to her home and "drank a few beers". *Id.* at p. 121.

While he was at Bill Niswonger's house, George contacted the Boyd County Sheriff's Department to report the assault. Deputy Jason Nattier learned of the call at approximately 9 p.m. [Docket No. 45, Deposition of Jason Nattier, p. 50]. He believed that the report would be within the jurisdiction of the Ashland Police Department, but because he was familiar with Bill's brother and the alleged attacker, Aaron Niswonger, from past cases, he drove to Bill Niswonger's house to assist with the call. *Id.* at. pp. 51-52.

Upon arrival at the Niswonger home, Nattier spoke to George, who told him he had been assaulted at Senters' home, which confirmed that the incident was within the jurisdiction of the Boyd County Sheriff. *Id.* at p. 54. Nattier discerned that George had been drinking, but that he

2

appeared lucid enough to provide details of Aaron Niswonger's assault on him. *Id.* George reported that he had been drinking with some friends, including Aaron Niswonger, earlier that night. *Id.* He stated that he had said something which angered Aaron, who then began hitting and kicking him. [Docket No. 41-1, KYIBRS REPORT]. According to George, the attack did not stop until blood was visibly coming out of his head. *Id.* Nattier also observed the laceration on George's's head, as well as the staples. [Docket No. 45, p. 53]. After giving his statement to Nattier, George was taken to Kings Daughters Medical Center. *Id.*

Nattier then began his investigation of the assault. He first went to Aaron Niswonger's home but no one was there. [Docket No. 45, p. 62]. He then drove to Senters' home and asked Deputies Scott Crawford and Greg Powers to meet him there. *Id.* at pp. 62-63.

The Deputies parked their cruisers and walked up the hill to Senters' house. *Id.* Nattier went to the front door, Crawford stayed back in the yard near where a truck was parked, and Powers went to the back of the house to ensure that no one ran out that door. *Id.* at p. 64.

Nattier knocked on Senters' front door. *Id.* at p. 66. Upon hearing the knock, Senters went to the window, looked outside, and saw the deputies. [Docket No. 46, p. 129]. Senters asked what they wanted and a deputy, she could not recall which one, replied that they were looking for Aaron Niswonger. *Id.* at pp. 130-131.

Senters testified that she asked the deputies why they were looking for Niswonger and one of them, she could not recall which one, threatened to arrest her for practicing medicine without a license. *Id.* Recognizing this to be a reference to the fight between George and Niswonger, Senters opened the door, went outside, and locked the door behind her. *Id.* at pp. 132-133.

3

Senters testified that one of the deputies asked to come inside, saying he would probably find blood. *Id.* at pp. 136.137. Senters refused consent for the deputies to go in her home. *Id.*

Nattier then asked for Senters' identification. *Id.* at p. 138. Without objecting, she unlocked the door and went inside to get her driver's license. *Id.* She returned back to the porch and locked the door behind her again. *Id.*

After returning with her license, Senters handed it to Nattier. *Id.* at pp. 139-140. Nattier took her license, looked at it, and explained to her that he needed to verify her information because she was a witness to a potential assault. *Id.* at pp. 143-145.

This is where the stories diverge.

Nattier testified that, at this point, Senters became verbally combative. According to Nattier, when he asked for her social security number Senters said "why do you F***ing need it?". He said because he asked for it. [Docket No. 42-2, Transcript of Jury Trial]. According to Nattier, Senters said to him, "give me my stuff" as she swung her right arm around toward his left hand in which he held her wallet and identification. *Id.* Nattier testified that he moved his hands out of the way and told her she was under arrest. *Id.*

Senters testified that after she gave Nattier her license, the officers asked whether Niswonger was in her house but she denied that he was inside. [Docket No. 45, pp. 143-145]. When she denied Niswonger was in the house, Senters claims the officers called her a "lying bitch" and a "liar" and, as a result, she became "very" upset. *Id.* Because she was upset, she threw her arms in the air, and yelled "bullsh***!" When she did this, Senters estimates that she was close to the officer, only between 2 and 5 feet away. *Id.* at p. 149.

4

According to both Nattier and Crawford, Senters did not merely throw her arms in the air, but, rather, swung her arm at Nattier as if she was attempting to strike him. [Docket No. 45, pp. 97-99].

Senters testified that one of the deputies told her she was under arrest and immediately took her to the ground. [Docket No. 46. p. 150]. Senters admits that she was ordered to put her arms behind her back, but claims that her body landed on her left arm and she was unable to bring it around behind her body in order to be handcuffed. *Id.* at pp. 159-161.

Crawford then warned Senters that she would be tased if she failed to bring her arm behind her back, but she still did not do it because her body was on top of her arm. *Id.* at pp. 161-163.

Shortly after receiving this warning, Crawford tased Senters in the middle of her back. *Id.*

During this time, Powers remained standing by the back of the house and approached only after he heard a commotion. [Docket No. 42-2, pp. 48, 90 and 99]. He held Senters' ankles while Nattier and Crawford were attempting to put her in handcuffs. *Id.* After Senters was placed in handcuffs, Powers promptly left to respond to another call. *Id.*

After Crawford tased Senters, she pulled her arm out from under her body and she was handcuffed. [Docket No. 46, p. 164]. The officers then sat her up and transported her to the Boyd County Detention Center. [Docket No. 45, p. 122].

Senters was charged with menacing in violation of KRS 508.050 and resisting arrest in violation of KRS 520.090. [Docket No. 42-3, Uniform Citation].

On August 3, 2016, a jury in the Boyd District Court found Senters guilty of resisting

5

arrest. [Docket No. 43-4].

This civil action followed. Discovery is complete and Defendants seek judgment as a matter of law.

## II.

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party. A non-moving party cannot withstand summary judgment, however, by introduction of a "mere scintilla" of evidence in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). There must be sufficient evidence upon which a jury could reasonably find for the plaintiff. *Id.*

## III.

**A.  Defendant Boyd County Sheriff Office is entitled to judgment as a matter of law.**

Plaintiff concedes that this Defendant is not an entity *sui juris* under Kentucky law and, as such, cannot be sued. Therefore, Plaintiff's claims against this Defendant will be dismissed.

**B.  Plaintiff's false arrest claim fails as a matter of law.**

In order to maintain her claim for false arrest, Plaintiff bears the burden of establishing that her arrest lacked probable cause. *See generally, Burley v. Gagacki,* 834 F.3d 606, 614 (6th Cir. 2016). In this case, Senters was convicted of resisting arrest. This fact, in and of itself,

6

establishes that her arrest was based upon probable cause. *Heck v. Humphyreys*, 512 U.S. 477, 487 (1994). A constitutional challenge to her arrest necessarily implicates the validity of the conviction which, to date, has not been overturned or otherwise invalidated. Under *Heck*, her claim fails.

**C.    Plaintiff's due process claim fails as a matter of law.**

Senters claims that Defendants violated her due process rights under the Fifth and Fourteenth Amendments of the United States Constitution. This claim is merely a reiteration of her Fourth Amendment false arrest and excessive force claims, which are discussed *infra*, and is, in effect, subsumed by them. *See generally, County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

**D.    Plaintiff's state law claims of battery, false imprisonment and outrage fail as a matter of law.**

In her response to Defendants' dispositive motion, Senters makes no argument in support of her claim for battery, apart from her arguments with regard to excessive force, which are discussed *infra*.

With regard to false imprisonment, the absence of probable cause is an essential element of that claim. *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007). As set forth *supra*, probable cause was not absent, but present, as established by Senter's conviction for resisting arrest. Therefore, the claim fails. To the extent that Senters suggests that Nattier "imprisoned" her by taking control of her wallet, she cites no legal authority which would support her extremely broad view of the tort. Moreover, even if there were caselaw in that regard, Senters admitted that she gave her wallet to Nattier upon his request and did not demand it back prior to her request. [Docket

7

No. 45, pp. 138-139]. She cannot, therefore, now maintain that she as not free to leave or was somehow confined by Nattier's request to see her identification.

As for outrage, Senters, again, cites no case or other legal authority in support of her claim. As such, it fails as a matter if law.

E. **Defendants, in their individual capacities, are entitled to qualified immunity as to Plaintiff's clam of excessive force.**

In the Sixth Circuit, public officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992). When the defense of qualified immunity is raised within the context of a motion for summary judgment, the non-movant must allege facts sufficient to indicate that the act in question violated clearly established law at the time the act was committed. *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir. 1987). The ultimate burden of proof is on the plaintiff to prove that the defendant is not entitled to qualified immunity as a matter of law. *Wegener v. City of Covington*, 930 F.2d 390, 392 (6th Cir. 1991); *Rich v. City of Mayfield Heights*, 995 F.2d 1092, 1095 (6th Cir. 1992). The Sixth Circuit, *en banc*, has defined the components of the qualified immunity defense:

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known. The procedure for evaluating claims of qualified immunity is tripartite: first, we determine whether a constitutional violation has occurred; second, we determine whether the right that was violated was a clearly established right of which a reasonable person would have known; finally, we determine whether the

8

> Appellee has alleged sufficient facts, and supported the allegations
> by sufficient evidence, to indicate that what the official allegedly
> did was objectively unreasonable in light of the clearly established
> constitutional rights.

*Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999)(*citing Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Dickerson v. McClellan*, 101 F.3d 1151, 1157-58 (6th Cir. 1996)).

"A claim of qualified immunity presents two closely linked questions: whether the Defendant violated the Plaintiff's rights and whether those rights were clearly established at the time of the violation." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)(*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001)). As the Supreme Court explained, "[t]he court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [public official's] conduct violated a constitutional right? This must be the initial inquiry." *Saucier v. Katz*, 533 U.S. at 201.

The crux of Plaintiff's case is her claim of excessive force. Allegations that police officers used excessive force in the course of an arrest should be analyzed under the Fourth Amendment and its "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Under this standard, the court must take into consideration the totality of the circumstances. *Id.* at pp. 396-397. The "reasonableness" of a particular use of force by law enforcement is objective and "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at p. 396.

The Sixth Circuit has held "we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Boyd v. Baeppler*,

215 F.3d 594, 602 (6th Cir. 2000). In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397. An officer making an arrest has "the right to use some degree of physical coercion or threat thereof to effect it." *Miller v. Sanilac Co.*, 606 F.3d 240, 251 (6th Cir. 2010). "The question we must ask is whether, under the totality of the circumstances, the officer's actions were objectively reasonable." *Fox v. DeSoto*, 489 F.3d 227, 236-237 (6th Cir. 2007)(*citing Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)). "The question of whether an officer's actions were objectively reasonable 'is a pure question of law' for the court. *Kowolonek v. Moore*, 2010 WL 1253140, *6 (E.D. Ky. 2010) (*quoting Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)).

In determining whether there has been a violation of the Fourth Amendment, the Sixth Circuit has held "we consider not the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" *Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009)). "Determining the reasonableness of the force used under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Dickerson v. McClellan,* 101 F.3d 1151, 1162 (6th Cir. 1996)(*quoting Graham*, 490 U.S. at 396)(internal quotation marks and citation omitted). "Factors to consider when addressing the reasonableness of a law enforcement officer's actions include: (1) the severity of the crime involved, (2) the immediacy of the threat to officers and others, and (3) whether the suspect is resisting arrest or attempting to flee." *Tallman v. Elizabethtown Police Dept.*, 167 Fed. Appx.

459, 462 (6th Cir. 2006)(*citing Graham*, 490 U.S. at 396).

I. **Nattier's conduct was reasonable.**

Applying the *Graham* analysis to this case, Nattier's conduct was reasonable. With regard to the first factor, the crime involved was assault; Nattier was investigating the assault against George. When he interacted with Senters, he did not know of the extent, if any, of her involvement in the assault. Nor did he know if the alleged assailant, Aaron Niswonger, was on the premises.

Further, Senters admits that she was angry, used profanity and threw her arms in the air while in close proximity to Nattier and Crawford. While she asserts that she was merely expressing frustration and, presumably, had no intent of hitting the deputies, Nattier did not, and could not, know of her subjective intent.

Finally, Senters also admits that she did not bring her arms behind her back to allow handcuffing. Again, she claims she could not but, again, the deputies did not know that at the time they were attempting to handcuff her. From the point of view of a reasonable officer, Senters was resisting arrest. Active resistance includes "physically struggling with, threatening, or disobeying officers." *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 495 (6th Cir.2012). It also includes refusing to move or give hands for police to handcuff a suspect when coupled with other acts of defiance. *Caie v. W. Bloomfield Twp.*, 485 Fed.Appx. 92, 94, 96–97 (6th Cir.2012)

In similar circumstances, courts in the Sixth Circuit have approved an officer's use of restraining force to subdue and arrest a resistant suspect. In *Slusher v. Carson,* the Sixth Circuit held that an officer's use of brief and minor restraining force was permitted under the Fourth Amendment where it was used to control a suspect who was argumentative and refused to

11

comply with his orders. *Slusher v. Carson*, 540 F.3d 449 (6th Cir. 2008).

More recently, in *Lee v. City of Norwalk*, the Court held that an officer did not violate the Fourth Amendment when he pushed the plaintiff, who had behaved in an argumentative and abusive fashion, down into a chair and briefly restrained his arms. *Lee v. City of Norwalk*, 529 Fed.Appx. 778 (6th Cir. 2013).

Law enforcement officers are permitted to use moderate amounts of force to subdue arresstees who, like Senters, are abusive, agitated, and noncompliant. Based upon Senters own admissions and the standard articulated in *Graham* and its progeny, the force used by Nattier on Senters was reasonable under the Fourth Amendment.

### ii. Crawford's conduct was reasonable.

Senters alleges that Crawford's use of a taser was excessive force. However, it is undisputed that he used the taser only after Senters failed to comply with the deputies' directive to place her arms behind her back so that she could be handcuffed. Senters claims she was unable to move her arm. Crawford did not know this. Based upon the melee unfolding before him, it would appear that Senters was merely resisting arrest. The determinative concern under qualified immunity and reasonableness analyses is the perspective of the officers and their perception of events as they unfolded. Great allowance is given for unknown or misinterpreted realities of the circumstances in a rapidly evolving situation. His actions pass *Graham* muster.

### iii. There is no proof Powers used force against Senters.

Powers held Senters' feet during the arrest. Senters admits that this falls short of proof of excessive force. At most, he exerted *de minimus* force which is not enough to support a claim against him.

12

Viewed in the light most favorable to Plaintiff, the evidence indicates that Plaintiff failed to comply with the deputies' orders and only the force necessary to obtain compliance was utilized.

**F.    Plaintiff's claims against Defendants in their official capacities fails as a matter of law.**

"Official-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent. As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 156-66, 105 S.Ct. 3099, 87 L.Ed.2d 144 (1985).   Therefore, the claims against the individual Defendants in their official capacities represent claims against the entity for which they are agents and, pursuant to *Graham*, its predecessor *Monell v. Department of Social Services of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and its progeny, are redundant and should be dismissed.

**G.    Plaintiff's claim against Boyd County fails a matter if law.**

Section 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior. Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 692–94 (1978).   A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Id.* A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: 1) facially unconstitutional as written or articulated, or 2) facially constitutional but consistently implemented to result in constitutional

violations with explicit or implicit ratification by city policymakers. *Id*. Where the identified policy is itself facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 407 (1997).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410, 117. In other words, the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be "plainly obvious." *Id*. at 412; *see also Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir.1997).

The courts recognize a systematic failure to train police officers adequately as custom or policy which can lead to city liability. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only when the failure to train amounts to "deliberate indifference" on behalf of the city toward its inhabitants, however, will failure to train lead to city liability under § 1983. *Id*. at 389. The Supreme Court explained this standard in *Harris*:

> The issue ... is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

14

*Id.* at 390 (footnotes omitted).

Plaintiff can survive summary judgment under this standard by showing that officer training failed to address the use of excessive force and that such a failure has the "highly predictable consequence" of constitutional violations of the sort Plaintiff claims she suffered.

Senters' proof in this regard is inadequate. She cites no law to support her claim or facts which support her allegation. The only proof she offers is that Natter was involved in an incident three years prior to her arrest, in which an arrestee suffered injury. Yet this incident, assuming it is true, does not show a pervasive pattern of tolerance of excessive force on the part of Boyd County.

## IV.

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. Viewing the facts in the light most favorable to Plaintiff, there are no issues of material fact which remain and Defendants are entitled to judgment as a matter of law.

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 42] be **SUSTAINED** the Plaintiff's claims against the Defendants be **DISMISSED WITH PREJUDICE.**

May 21, 2018.

Signed By:
*Henry R. Wilhoit, Jr.*
United States District Judge

15